IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ARETHA EBONY HARRIS, | ) | CASE NO.  1:22-CV-01538-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Aretha Harris ("Plaintiff" or "Harris"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i),

423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b)

for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be VACATED and REMANDED for further proceedings

consistent with this opinion.

## I.    PROCEDURAL HISTORY

In October 2019, Harris filed an application for SSI, alleging a disability onset date of January 1,

2004[2] and claiming she was disabled due to anxiety, asthma, allergies, endometriosis, polycystic ovarian

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
[2] At the hearing, Harris amended the alleged onset date to the protective filing date of October 3, 2019.
(Transcript ("Tr.") 15.)

1

syndrome, fibromyalgia, osteoporosis, arthropathy, GERD, gout, herniated disc disease, degenerative disc disease, spondylosis, kidney donation, learning disability, and migraines. (Transcript ("Tr.") 15, 143-44, 164.) The application was denied initially and upon reconsideration, and Harris requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 15.)

On November 9, 2020, an ALJ held a hearing, during which Harris, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On February 2, 2021, the ALJ issued a written decision finding Harris was not disabled. (*Id.* at 15-38.) The ALJ's decision became final on July 12, 2022, when the Appeals Council declined further review. (*Id.* at 1-6.)

On August 31, 2022, Harris filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7-9.) Harris asserts the following assignments of error:

(1) The ALJ erred in forming his RFC when he failed to properly consider and evaluate Harris's severe impairments in accordance with Social Security Rulings 12-2p and 19-4p.

(2) The ALJ erred when he failed to find at Step Three of the Sequential Evaluation that Harris either satisfied or equaled the criteria of Listing 12.07.

(3) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and found that the effect of the combination of Harris's symptoms, including pain, allowed her to engage in substantial gainful activity on a full-time and sustained basis.

(Doc. No. 7.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Harris was born in August 1982 and was 38 years-old at the time of her administrative hearing (Tr. 15, 37), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. § 416.963(c).

2

She has at least a high school education.  (Tr. 37.)  She has past relevant work as a janitor and a caregiver. (*Id*. at 36.)

**B.  Medical Evidence[3]**

On October 14, 2019, Harris saw Elizabeth Beach, CNM, for urinary frequency and pelvic and vaginal pain.  (Tr. 363.)  On examination, Beach found abdominal tenderness and guarding, normal range of motion, full orientation, and normal mood, memory, affect, and judgment.  (*Id.*)

On October 22, 2019, Harris underwent a neurological evaluation for her migraines.  (*Id.* at 491.) Harris told Virginia Edwards, APRN-CNP, that she had never had migraine headaches before she was in a motor vehicle accident in April and hit her head on something in the third row.  (*Id.* at 491-92.)  Harris described feeling "intense pressure" like something was "'crushing her skull,'" followed by nausea and photophobia.  (*Id.* at 493.)  The headaches lasted for hours and were getting progressively worse.  (*Id.*) Harris reported Sumatriptan had not helped.  (*Id.*)  Harris also complained of memory problems since the accident.  (*Id.*)  Harris rated her pain as a 10/10.  (*Id.* at 495.)  Her headaches occurred daily.  (*Id.* at 496.) On examination, Edwards found reduced pinprick sensation on the left, soft palate rises on phonation, normal muscle strength and tone, negative Babinski sign, and normal gait.  (*Id.* at 495.)  Harris reported the sensory changes on the left were not new.  (*Id.* at 496.)  Edwards noted Topamax may be contributing to Harris' memory problems.  (*Id.*)  Edwards ordered an MRI and a trial of Effexor.  (*Id.*)

That same day, Harris completed an adult function report.  (*Id.* at 256-63.)  Harris reported getting weak throughout the day from sitting too long or from standing or walking for ten minutes.  (*Id.* at 256.) Her hands and feet hurt all day from the problems she has.  (*Id.*)   Her conditions sometimes affected her ability to dress and bathe and affected her ability to cook.  (*Id.* at 257.)  Sometimes she had memory problems so others would help her with her medication.  (*Id.* at 258.)  She prepared meals once a month.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id.*)  She went out four times a week for doctor appointments, drove a car, and could go out alone.  (*Id.* at 259.)  She went food shopping twice a month.  (*Id.*)  She could pay bills, count change, handle a savings account, and use a checkbook or money orders.  (*Id.*)  Harris did not have any hobbies or interests.  (*Id.* at 260.)  She had trouble getting along with others as she was always in pain and could not do what they wanted.  (*Id.* at 261.)  She could walk for eight minutes before needing to stop and rest.  (*Id.*)  She could pay attention for two minutes.  (*Id.*)  She could follow written and spoken instructions "not well but ok," and she got along "ok" with authority figures.  (*Id.* at 261-62.)  She did not handle stress or changes in routine well.  (*Id.* at 262.)  When she was weak, she sometimes needed to use a walker or cane.  (*Id.*)

On October 23, 2019, Harris underwent bilateral SI joint injections for her sacroiliitis.  (*Id.* at 490-91.)  Brendan Astley, M.D., noted a "significant history of low back pain, low back pain with radiation to the lower extremity, and pelvic pain."  (*Id.* at 491.)  Dr. Astley further noted the injections resolved Harris' symptoms.  (*Id.*)

On October 24, 2019, Harris went to the emergency room with complaints of headache, chest pain, left-sided numbness, and shortness of breath for the past two hours.  (*Id.* at 427.)  Treatment providers noted Harris was diabetic and on Metformin.  (*Id.* at 428.)  Treatment providers administered medication and discharged Harris with instructions to follow up with her primary care physician.  (*Id.* at 429.)  Treatment providers noted Harris "ambulated with [a] steady gait out of the ED."  (*Id.*)

A head MRI taken October 29, 2019 was normal.  (*Id.* at 880-81.)

On November 1, 2019, Harris saw Angela Grady, DPM, for bilateral heel pain, right worse than left.  (*Id.* at 875.)  Harris reported the pain was the worst in the morning and she could "barely put her foot down in the morning."  (*Id.*)  On examination, Dr. Grady found 5/5 muscle strength on the right and 4/5 on the left, pain free range of motion, pain with palpation to the bilateral medial calcaneal tubercle and medial band of plantar fascia, pain with lateral compression of the right calcaneus, and pain with palpation

4

of the right Achilles tendon at insertion onto the calcaneus.  (*Id.* at 877.)  Dr. Grady instructed Harris to stretch and use ice and administered a lidocaine injection into Harris' right heel.  (*Id.*)  Dr. Grady noted Harris was not interested in physical therapy at that time.  (*Id.*)

On November 12, 2019, Harris received a lidocaine infusion for her chronic pain syndrome.  (*Id.* at 866.)  Before the infusion, Harris rated her pain as a 9/10.  (*Id.*)  After the infusion, Harris rated her pain as a 7/10.  (*Id.*)

On November 14, 2019, Harris underwent a sleeve gastrectomy revision.  (*Id.* at 974-76.)

On November 19, 2019, Harris completed another adult function report.  (*Id.* at 292-99.)  Harris reported her hips were the worst now and she liked to lay down because anything else made her very weak.  (*Id.* at 298.)  She reported she is always with someone, and her family helps her get ready for her appointments and picks her up and drops her off.  (*Id.* at 298-99.)  She cannot walk more than 15 feet without stopping.  (*Id.* at 299.)  She takes sleeping pills but only sleeps two hours a night because of her pain.  (*Id.*)  She needed help pulling up her pants and putting on shoes, she needed help in the mornings because she was weaker, and others cooked for her.  (*Id.*)  She needed reminders to take her medications.  (*Id.* at 297.)  Her family brought her food that she warmed up.  (*Id.*)  She wiped off the table.  (*Id.*)  Sometimes her depression made her not want to be around others.  (*Id.* at 294.)  She could not go out alone anymore.  (*Id.*)  She could walk 15 feet before needing to stop and rest for 10 minutes.  (*Id.*)  She cannot pay attention for long.  (*Id.*)  She followed written instructions "ok" but did not follow spoken instructions well.  (*Id.*)  Her family took care of her bills.  (*Id.* at 295.)  She had no hobbies or interests.  (*Id.*)  People came to see her every day to help her and make sure she was okay.  (*Id.*)  She could ride in a car and use public transportation.  (*Id.* at 296.)  Most of the time she used paratransit or transportation with Medicare.  (*Id.*)  She drove sometimes if she had no one to help her get back and forth from an

appointment.  (*Id.*)  She shopped for food once a month with family.  (*Id.*)  She could pay bills, count change, handle a savings account, and use a checkbook or money orders.  (*Id.*)

On November 21, 2019, Harris went to the hospital with complaints of abdominal pain.  (*Id.* at 963.)  Treatment providers noted:

> Patient has been somewhat inconsistent with the degree of symptoms and complains [sic] over the day and during the consult.  Her vital signs are completely normal without tachycardia or fever.  She does not look sick at all. Her physical exam with distraction, she has a completely soft abdomen without rebound tenderness.  She states that had some BM in the form of diarrhea.  She did not loose [sic] any weight since surgery.  No major complains [sic] on reflux. No upper abdominal pain or shoulder pain or hiccups.  She was able to lay down and sitting up without evidence on major discomfort.  She was able to smile and keep a conversation without pause due to pain.  There was clearly a discordance between the patient complains [sic] and her clinical signs including her physical exam and vital signs.  She has some discomfort over one of the LLQ port site and just in case we will order a CT ABD/Pelvis with oral contrast only . . . to check for a reason of pain (hematoma? Hernia?, etc), although there is no bulging or significant induration on that area.

(*Id.*)

On December 5, 2019, Harris saw Todd Markowski, APRN-CNP, for pain management of her chronic pain secondary to lumbar degenerative disc disease at L5-S1 and bilateral hip osteoarthritis.  (*Id.* at 954.)  Harris reported her pain remained unchanged since her last appointment and described it as sharp, dull, cramping, and continuous.  (*Id.*)  Markowski noted Harris was on Norco, which Harris reported improved her ability to perform her activities of daily living.  (*Id.*)  Lidocaine injections also helped her pain.  (*Id.* at 955.)

On December 10, 2019, Harris received another lidocaine infusion.  (*Id.* at 953.)  Markowski noted Harris' previous lidocaine infusions had provided an 85% reduction in pain for four weeks.  (*Id.*)

On January 1, 2020, Harris saw Victoria Liao, Psy.D., for a consultative psychiatric evaluation. (*Id.* at 1078.)  Harris reported seeking disability for mental health issues, back issues, and health issues. (*Id.*)  Harris told Dr. Liao that her health had deteriorated over the past few years.  (*Id.*)  Harris denied any

psychiatric hospitalizations and reported being in therapy for major depressive disorder with current active episode. (*Id.* at 1079.) Harris told Dr. Liao she had been hospitalized several times for physical health issues. (*Id.*) Every three months, she underwent an RFA procedure. (*Id.*) Harris denied suicidal or homicidal ideation, hallucinations, and delusions, and endorsed poor sleep, poor appetite, panic attacks a few times a week, irritability, agitation, isolation, flashbacks, distressing memories, nightmares, hypervigilance, constant negative emotions, few positive emotions, feelings of hopelessness, helplessness, and worthlessness, fatigue, loss of motivation, and problems with attention and concentration. (*Id.* at 1080.) Harris denied being able to dress, bathe, and cook herself, and reported a friend helped her with these things. (*Id.* at 1082.) Harris reported being able to feed herself, shop, and manage money. (*Id.*) Harris denied having hobbies or interests and spent her day laying down and watching TV. (*Id.*) Harris reported distant social and familial relationships. (*Id.*)

On examination, Dr. Liao found Harris cooperative with appropriate eye contact, a walking aid, no postural issues or motor behaviors, appropriate speech, normal expressive and receptive language skills, a dysphoric and anxious affect, dysthymic and anxious mood, clear sensorium, and fair judgment and insight. (*Id.* at 1080-81.) Dr. Liao noted Harris was unable to complete serial 7s and partially able to complete serial 3s due to mood disturbances, although Harris could count and perform simple mathematical calculations. (*Id.* at 1081.) Harris could immediately recall three out of three objects but was unable to recall any of the objects after a time delay. (*Id.*) Dr. Liao determined Harris' intellectual functioning was in the average range. (*Id.*) Dr. Liao diagnosed Harris with PTSD and unspecified depressive disorder. (*Id.* at 1082.) Dr. Liao opined Harris had limitations in her ability to understand, remember, and carry out instructions due to mood disturbances. (*Id.* at 1083.) Dr. Liao further opined Harris had impairments in her ability to maintain attention and concentration for simple and multi-step

tasks due to mood disturbances. (*Id.*) Dr. Liao determined Harris had no limitations in her ability to respond to supervision, coworkers, or work pressures in a work setting. (*Id.*)

On January 28, 2020, Harris saw APRN-CNP Edwards for follow up regarding her headaches. (*Id.* at 1279-80.) Harris reported her headaches remained unchanged and that she did not want to stop Topamax as it had helped her best; while her memory was poor, the benefits outweighed the risks. (*Id.* at 1280.) Harris told Edwards she was unsure if Effexor was helping but reported no side effects. (*Id.*) Harris rated her pain that day as a 10/10. (*Id.* at 1283.) On examination, Edwards found Harris in no distress with a normal neurological examination, full strength, normal coordination, and normal gait. (*Id.* at 1283-84.) Edwards increased Effexor, directed Harris to keep a headache calendar, and recommended follow up in two months or as needed. (*Id.* at 1284.)

On February 14, 2020, Harris saw Stephen Cheng, M.D., for bilateral hand pain and numbness at the base of her thumbs that had worsened since November and was greater on the left than the right. (*Id.* at 1269.) On examination, Dr. Cheng found full range of motion of the wrist and hands, bilateral thumb tenderness at the CMC, grossly normal sensory exam, normal stability, and no significant swelling. (*Id.* at 1271.) Dr. Cheng noted Harris insisted on bilateral cortisone injections in her thumbs, which Dr. Cheng advised against, but because Harris felt so strongly, he administered them. (*Id.*)

On February 20, 2020, Harris underwent another lidocaine infusion. (*Id.* at 1266.) Toni Wilcox, APRN-CNP, noted Harris' previous infusions had provided a 70% improvement in her pain for six weeks. (*Id.* at 1267.) Before the infusion, Harris rated her pain as a 10/10. (*Id.* at 1268.) After the infusion, Harris rated her pain as a 0/10. (*Id.*)

On March 4, 2020, Harris saw Dr. Grady for follow up of her bilateral plantar fasciitis and right Achilles tendonitis. (*Id.* at 1263.) Harris reported an injection in her right heel had helped, but her left heel was hurting that day. (*Id.*) Harris denied stretching or icing and reported that Norco did not help her

8

foot pain.  (*Id.*)  Harris told Dr. Grady she had recently started walking on a treadmill.  (*Id.*)  On examination, Dr. Grady found decreased sensation to light touch to the left digits, 4/5 muscle strength on the left, and pain with lateral compression of the calcaneus.  (*Id.* at 1265-66.)  Dr. Grady recommended stretching and icing and administered a left heel injection.  (*Id.* at 1266.)

On March 6, 2020, Harris saw Amy Ebbitt, APRN, CNP, for her headaches.  (*Id.* at 1090.)  Harris reported being on Effexor 75 ER daily and felt she was not seeing a significant effect.  (*Id.* at 1091.)  Insurance would not cover a trial of Botox injections.  (*Id.*)  Ebbitt noted she would contact neurology about whether she could increase Harris' Topamax dose; while Harris had been concerned about brain fogginess, she now was interested in trying a higher dose as she was struggling almost daily.  (*Id.*)

On March 12, 2020, Harris saw Jaline Wilkes, CNP, for continued migraines that she rated as more than a 10/10 on a pain scale.  (*Id.* at 1148.)  Wilkes noted Harris was ill-appearing.  (*Id.* at 1149.)  Wilkes found no focal deficit on examination.  (*Id.*)  Wilkes referred Harris to the emergency department for pain management as she was taking all her migraine medication without much relief and over the counter medications would not help.  (*Id.*)

On March 31, 2020, Harris saw APRN-CNP Edwards for follow up regarding her headaches.  (*Id.* at 1322-23.)  Edwards noted Harris was taking Effexor and Topamax and was still having terrible throbbing, pounding headaches more than 15 days a month.  (*Id.* at 1323.)  Harris also complained of left-side numbness that had happened five times in the past two months.  (*Id.*)  Harris reported it started in her toes and went up to her head, and her left side got numb and weak.  (*Id.*)  Edwards increased Harris' Topamax.  (*Id.*)  Edwards noted the left-sided numbness and weakness had been evaluated in the emergency department and Dr. Winkelman felt it was psychogenic.  (*Id.*)  Edwards thought migraine aura or focal seizures were possible and referred Harris for an EEG.  (*Id.*)

On May 8, 2020, Harris received bilateral hip bursa injections, which resulted in "complete resolution of her symptoms." (*Id.* at 1316-17.)

On May 14, 2020, Harris saw Sarah Demko, APRN-CNP, regarding her migraines. (*Id.* at 1311.) Harris reported the increased Topamax helped and she could feel it working. (*Id.*) Harris wanted to talk about Botox injections. (*Id.*) She did not feel Effexor was helping. (*Id.*) Harris reported daily migraines, a sickness consisting of headache, left-sided numbness that was paralyzing her body, being bed-bound due to pain, nausea, and photophobia and phonophobia. (*Id.*) On examination, Demko found intact sensation, intact coordination, and a steady gait with cane use. (*Id.* at 1314.) On the motor examination, Demko noted "[e]ffort vs ability," and while Harris could walk, Harris stated her left leg was weak and she was unable to lift it. (*Id.*) Demko found full upper extremity strength. (*Id.*) Demko wrote under Impressions/suggestions: "Daily persistent headaches with migraine, post traumatic following MVC. Pt stated debilitating pain and interested in Botox. Patient also with transient episodes of numbness and tingling. Pt to have EEG completed after visit." (*Id.* at 1315.) Demko "urged" Harris to undergo the EEG, ordered Botox, renewed Effexor and Topamax, and directed Harris to follow up as scheduled. (*Id.*)

That same day, Harris underwent an EEG, which was normal. (*Id.* at 1315-16.)

On May 22, 2020, Harris underwent a lumbar medial branch radiofrequency rhizotomy at L3, L4, and L5 for osteoarthritis of the spine. (*Id.* at 1448-49.)

On May 30, 2020, Harris was admitted to Euclid hospital for abdominal pain that had occurred for two to three days. (*Id.* at 1483.) Treatment providers administered morphine, Harris lost consciousness after the dose was administered, and treatment providers administered Narcan. (*Id.*) Harris accused staff of overdosing her and requested a transfer to the Cleveland Clinic. (*Id.*) After undergoing an EGD, Harris developed left-sided flaccidity and eyelid fluttering, and neurology thought she may have had a seizure and stroke. (*Id.*) A CT and MRI were normal. (*Id.*) Treatment providers noted waxing and waning

neurology examinations during her stay.  (*Id.*)  While Harris continued to complain of left arm weakness, treatment providers noted Harris moved her left arm when she was unaware of being watched, raising concerns about malingering.  (*Id.*)  Harris was transferred to Cleveland Clinic as requested.  (*Id.*)  During the hospitalization, treatment providers noted "[m]ultiple signs on physical [were] not compatible with a primary neurologic deficit," that there was "no neurologic explanation for non-functioning CN 2-12 on the left side, along with left sided face and body weakness/numbness/tingling," and that the "the most likely etiology of her symptoms is functional."  (*Id.* at 1497.)

Harris also underwent a psychiatric consult during her hospital stay.  (*Id.* at 1503.)  Harris endorsed chronic depression, poor sleep, and acute and chronic anxiety with occasional feelings of panic characterized by numbness and tingling.  (*Id.*)  On examination, Pilar Lachtwani, M.D., found hypokinetic, initially guarded, mildly irritable, suspicious, and dismissive behavior, but noted Harris was later readily engaged and appropriately tearful at times, and she smiled at times.  (*Id.* at 1507.)  Dr. Lachtwani further found retarded psychomotor ability, full orientation, mild memory impairment, intact attention and concentration, "'terrified'" mood, sad and reactive affect with a restricted range, occasional stuttering, soft speech, overinclusive and appropriate tone, prosody, cadence, phonetics, and syntax, coherent and goal-oriented thought, somatically focused thought content, no suicidal or homicidal ideation, and appropriate judgment and insight.  (*Id.*)  Dr. Lachtwani found "no obvious manipulative behavior suggesting primary gain" indicative of factitious disorder and "no obvious source of secondary gain" indicative of malingering, but noted factitious disorder, malingering, somatic symptom disorder, and functional neurologic symptom disorder were all diagnoses of exclusion.  (*Id.* at 1508.)  Dr. Lachtwani diagnosed Harris with depression by history, chronic pain syndrome by history, medically unexplained symptoms, rule out functional neurologic symptom disorder, rule out somatic symptom disorder, doubt factitious disorder, and doubt malingering.  (*Id.* at 1509.)

11

On June 29, 2020, Harris was admitted for removal of a left ovarian cyst and underwent a stroke evaluation for left-sided numbness, stuttering speech, and vision changes. (*Id.* at 1939.) Dr. Andrew Russman noted a nurse was talking with Harris while she was eating and Harris complained of numbness on her left side, then difficulty seeing, then speech changes and difficulty getting words out ant stuttering. (*Id.*) On examination, Dr. Russman noted right-gaze preference that was overcome with occulocephalics, Harris did not participate fully in the exam but would not let her arm fall to her face, saccades with opticokinetic strip, and inconsistent stuttering speech that was at times fluent. (*Id.*) Dr. Russman further found Harris alert, with the ability to communicate at times and intermittently follow commands, no facial droop, normal tone on the right and left, that Harris would let her arm hit the bed but not her face, no movement in the left lower extremity, normal reflexes, no response to noxious stimulation in the left upper or lower extremity, and intact coordination in the right upper extremity. (*Id.* at 1944.) Dr. Russman determined Harris' symptoms were "consistent with a functional neurologic disorder and not concerning for acute stroke" at that time. (*Id.* at 1946.)

On July 9, 2020, Harris saw Victoria Cooper Whitehair, M.D., for a Botox injection for her chronic migraines. (*Id.* at 2490-91.) Harris described her headaches as pressure, pulsating, and located in the frontal region, with the worst pain in the past month a 10/10. (*Id.* at 2490.) Related symptoms included nausea, photophobia, and phonophobia. (*Id.*) Noise and smells made her headaches worse, while sleep, quiet, and a dark room improved them. (*Id.*) Harris reported more than 15 migraines a month that lasted several hours to a full day. (*Id.*) Harris took Topamax and Effexor to prevent her migraines with partial relief and took Tylenol and ibuprofen with no relief. (*Id.*) Dr. Whitehair administered the Botox injection and recommended repeat injections in three plus months. (*Id.* at 2491.)

From August 5-7, 2020, Harris was hospitalized for pyelonephritis. (*Id.* at 1865.)

12

Harris received counseling and psychiatric services at Signature Health throughout 2020. (*Id.* at 1342-35, 2420-62.)  During a psychiatric appointment on August 27, 2020, Harris reported her paralysis was gone.  (*Id.* at 2453-54.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On January 25, 2020, Karla Delcour, Ph.D., reviewed the file and determined Harris had no limitation in her ability to understand, remember, or apply information, moderate limitations in her abilities to interact with others and concentrate, persist, or maintain pace, and a mild limitation in her ability to adapt or manage herself.  (*Id.* at 156.)  Dr. Delcour adopted the MRFC findings from the ALJ decision dated May 4, 2016.  (*Id.* at 160.)

On June 17, 2020, on reconsideration, Cynthia Waggoner, Psy.D., affirmed Dr. Delcour's findings. (*Id.* at 169-70, 172-73.)

**2.      Physical Impairments**

On January 14, 2020, Leanne Bertani, M.D., reviewed the file and determined Harris could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for four hours, and sit for about six hours in an eight-hour workday.  (*Id.* at 158.)  Dr. Bertani limited Harris to frequent push/pull with the bilateral lower extremities.  (*Id.*)  Harris could occasionally climb ramps/stairs, but never climb ladders, ropes, or scaffolds.  (*Id.* at 159.)  Harris could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Harris must avoid concentrated exposure to hazards.  (*Id.* at 160.)

On June 17, 2020, on reconsideration, W. Scott Bolz, M.D., affirmed Dr. Bertani's findings.  (*Id.* at 171-72.)

**D.      Hearing Testimony**

During the November 9, 2020 hearing, Harris testified to the following:

13

- She believes she is disabled because she has to attend many different procedures every week "in order to survive." (*Id.* at 50.)  She has a lot of illnesses. (*Id.*)  She cannot work. (*Id.*)  When she did work, she would need to bring her boss a letter saying she needed days off. (*Id.*)  Her employer "wasn't having that" because every time she had a procedure, she needed more than a day or two off. (*Id.*)  She has lidocaine procedures and bar phase procedures where she gets her spine burnt every two to three weeks for her nerves. (*Id.*)  She has bilateral hip injections so she can walk since she is too young for hip replacements. (*Id.* at 50-51.)  She has had these four procedures done every month for the past ten years. (*Id.* at 51.)  If she doesn't, she ends up with her walker or her cane. (*Id.*)

- She can drive a car. (*Id.*)  However, she tries to drive very little. (*Id.* at 52.)

- She uses a cane and a walker as needed, which were prescribed by her pain management doctor and her neurologist. (*Id.* at 51.)  She has also been prescribed a wheelchair and rollator. (*Id.*)

- On a typical day, she wakes up and goes to her appointments, which she tries to schedule in the morning. (*Id.* at 51-52.)  About half the time she has Care Transit or Lyft come pick her up. (*Id.* at 52.)  Her appointments take up most of her day. (*Id.*)  She tries to get back home by 3:00. (*Id.*)  When she gets home, she eats. (*Id.*)  She does not cook much, so most of her meals are TV dinners. (*Id.*)  Her family comes over to bring her things, help her, and take of her. (*Id.*)  She lays down after eating because she is too tired to do anything else. (*Id.*)

- She could not work a sit-down job because it is hard for her to sit for more than 20-30 minutes at a time. (*Id.*)  Her left hip is very bad and deteriorating, and her right hip is deteriorating as well. (*Id.* at 53.)  She has to alternate between sitting down and standing up. (*Id.*)

- She does not have any hobbies like she used to. (*Id.*)  She does not do much at all. (*Id.*)  She does not do the dishes. (*Id.* at 53-54.)  Her fiancée does the dishes. (*Id.* at 54.)  She does not do laundry. (*Id.*)  She can go to the grocery store. (*Id.*)  She goes once a month but does not go often because it is hard for her. (*Id.*)  She can't push a cart. (*Id.*)  She does not need her cane or walker when she gets her injections. (*Id.*)  When she does not get her injections, she uses her walker or cane often. (*Id.*)  Her injections last for a week or two. (*Id.* at 55.)

- She takes a lot of medications. (*Id.*)  She is taking pain killers. (*Id.*)  She has a lot of side effects from her medication, including nightmares, hallucinations, and severe depression. (*Id.*)

- She is in therapy for her mental health, which helps somewhat. (*Id.* at 55-56.)  She still needs her medication. (*Id.* at 56.)  The medications help somewhat. (*Id.*)

- She has bone pain and heart problems. (*Id.* at 57.)

14

- She has migraines.  (*Id.*)  She doesn't have regular headaches.  (*Id.* at 58.)  She gets Botox injections once a month.  (*Id.*)  She takes Topamax and another medication which she has to inject herself because of how bad her migraines get.  (*Id.*)

- Her body seems to paralyze itself, which treatment providers diagnosed as a conversion disorder.  (*Id.*)  She has been hospitalized several times for it.  (*Id.*)  Her left side and speech just go out.  (*Id.* at 59.)  It's like a stroke.  (*Id.*)  She has incontinence as part of the paralysis.  (*Id.* at 61.)  She has accidents twice a week.  (*Id.*)

- The plan for her overall health is to keep seeing her pain management doctor, the neurologist, and the psychiatrist, keep taking her medication, and try to reduce her stress.  (*Id.* at 60.)

The VE testified Harris had past work as a janitor and caregiver.  (*Id.* at 65-66.)  The ALJ then posed the following hypothetical question:

> Now, I'm going to give you the capabilities and limitations of a hypothetical person.  And for this person, I would ask you to tell me if they could do any or all of Ms. Harris's past work, and if not, whether there would be other jobs in significant numbers in the national economy that they could do.  This person is of the same age, education, and work background as Ms. Harris.  This hypothetical person can lift, carry 20 pounds occasionally, 10 pounds frequently, can stand and walk 4 out of 8, can sit 6 out of 8.  No limit on push, pull, or foot pedal.  Correction.  No limit on push, pull.  Foot pedal is frequent, bilaterally.  This person can occasionally use a ramp or stairs, but never a ladder, rope, or a scaffold, can occasionally balance, stoop, kneel, crouch, and crawl.  There are no manipulative, visual, or communication limits.  This person must avoid entirely dangerous machinery and – and unprotected heights.  This person can do no complex tasks but can do simple routine tasks, which are defined to mean that this person has the basic mental aptitude to do competitive, remunerative unskilled work, including the ability to, on a sustained basis, understand, carry out, and remember simple instructions.  This person can respond appropriately to supervision, coworkers, and usual work situations, and can deal with changes in routine work settings.  This person can focus attention on simple and routine work tasks or activities for at least 2 hours at a time, and stay on task at a sustained rate, such as initiating and performing a task that they understand and know how to do.  This person can work on an appropriate and consistent base, completing tasks in a timely manner.  This person can ignore or avoid distractions while working, can change activities or work settings without being disruptive, can do only low-stress work, meaning no high production quotas or piece-rate work.  And finally, this person can have superficial and occasional interactions with the public and peers, meaning contact is limited to signaling, taking instructions, asking questions, and similar contact, but with no arbitration, negotiation, confrontation, supervision, or commercial driving.  And that's it.

(*Id.* at 66-67.)

The VE testified the hypothetical individual would not be able to perform Harris' past work as a janitor and caregiver.  (*Id.* at 67.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as inspector or hand packager, assembler, plastic hospital products, and assembler, electrical accessories.  (*Id.* at 68.)  In response to questioning from counsel, the VE testified a person would be able to perform these jobs if needing to use a cane up to 1/3 of the workday or frequently.  (*Id.* at 70.)  The VE further testified that the identified jobs could be performed sitting or standing, so a sit/stand option would also not affect the jobs identified.  (*Id.* at 70-71.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 416.920(d).

16

Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since October 3, 2019, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, gout, fibromyalgia[,] migraines, asthma, gastrointestinal disorder status-post gastric bypass surgeries, somatoform disorder, depressive disorder, and posttraumatic stress disorder (PTSD).  (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) to include lift and/or carry 20 pounds occasionally, ten pounds frequently; stand and/or walk four hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and/or pull consistent the [sic] other exertional limitations; frequently use foot controls; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; never climb ladders, ropes, or scaffolds; never be exposed to hazards such as dangerous machinery and unprotected heights; can do no complex tasks; can do simple, routine tasks which I define to mean this person has the basic mental demands to do competitive, remunerative, unskilled work including the ability to, on a sustained basis, understand, carry out, and remember simple instructions; can respond appropriately to supervision, coworkers, and usual work situations and deal with changes in routine work settings; can focus attention on simple or routine work activities for at least 2 hours at a time and stay on task at a sustained rate such as initiating and perform a task that they understand and know how to do; can work at an appropriate and consistent pace; completing tasks in a timely manner; can ignore or avoid distractions while working; can change activities or work settings without being disruptive; can do only low stress work meaning no high production quotas or piece rate work; superficial occasional interactions with public and peers meaning contact is limited to speaking, signaling, taking instructions, asking

questions and similar contact and no arbitration, negotiation, confrontation, supervision or commercial driving.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on August **, 1982 and was 37 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 3, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-38.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

18

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

As part of her first assignment of error, Harris argues the ALJ erred when he failed to find Harris equaled Listing 11.02B with respect to her chronic daily headaches.  (Doc. No. 7 at 11.)  Harris asserts her "continued headaches equaled the criteria of Listing 11.02B," and she should have been found disabled at Step Three of the sequential disability evaluation.  (*Id.*)

In response, the Commissioner argues the ALJ considered much of the evidence Harris cites in the decision and maintains Harris "makes no effort to demonstrate that her symptoms meet each of the detailed requirements from § 11.02."  (Doc. No. 8 at 14.)  The Commissioner asserts that since Harris "failed to meet her burden of showing she met the listing, she has effectively waived her opportunity to challenge the ALJ's step three finding."  (*Id.*) (citation omitted).

In reply, Harris asserts she satisfied the criteria of Listing 11.02B "in that she had headaches occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment."  (Doc. No. 9 at 1.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  Essentially, a claimant who meets

the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

Primary headache disorders are not included in the listed impairments. However, a listing is medically equaled if "a primary headache disorder, alone or in combination with other impairment(s), medically equals a listing." SSR 19-4p, 2019 WL 4169635, at *7. The SSR instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. In pertinent part, Listing 11.02B involves "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite

21

adherence to prescribed treatment (see 11.00C)." 20 C.F.R. Part 404, Subpart P, App.1, § 11.02. In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Here, at Step Two, the ALJ determined Harris suffered from the severe impairment of migraines. (Tr. 18.) At Step Three, the ALJ determined Harris' impairments did not meet or medically equal the requirements of a Listing, explaining in part as follows:

> I have considered listing 11.02 and find that the claimant does not medically equal that listing. (SSR 19-4p). The claimant's headache disorder is not equivalent to a dyscognitive seizure occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. Nor are they equivalent to a dyscognitive seizure occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment resulting in marked limitation in physical functioning, understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing oneself. Therefore, the claimant does not medically equal listing 11.02.

(*Id.* at 20.)

The ALJ simply states, without any explanation, that Harris' headaches do not meet the criteria of Listing 11.02. The Sixth Circuit has found that, even where an ALJ's Step Three analysis is insufficient, remand is not required where the error is harmless. *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D.

Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn. March 26, 2015).  Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."  *Forrest*, 591 F. App'x at 366.  *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec*., Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

Here, the ALJ's RFC analysis fails to support the Step Three determination.  In the RFC analysis, the ALJ made the following statements regarding Harris' headaches that support, rather than detract from, findings of disability:

- "She claimed to have daily headaches.  (Exhibit C3F:14)."

- "She claimed her headaches lasted for hours with intense pressure, nausea, and sensitivity to light.  (Exhibit C3F:11)."

- "She went to the hospital with complaints of a headache, chest pain, left-sided numbness, and shortness of breath for two hours.  (Exhibit C2F:7; Exhibit C6F:13)."

- "In January 2020, she felt her headaches were essentially unchanged.  They were still occurring daily and she was open to trying new medications for them.  (Exhibit C13F:28, 32)."

23

- "In March 2020, she continued to complain of headaches that she felt had been triggered by a motor vehicle accident in April 2019. She indicated her headaches had not significantly improved with medication. (Exhibit C11F:5-6). She felt her headaches were particularly bad lately and described having them more than fifteen days a month. Exhibit C14F:23)."

- "She indicated an increased dosage of Topamax was helping with her headaches. She continued to describe daily migraines with nausea and sensitivity to sound and light."

- "She was getting Botox for her migraines. (Exhibit C22F:27)."

(*Id.* at 25-28.)

The medical evidence in the record shows consistent reports of continued chronic migraines which persisted even while taking both Topamax and Effexor as preventive medications. (*Id.* at 496, 1090-91, 1148-49, 1279-84, 1311-15, 1322-24, 1449-53.) In July 2020, Harris received Botox injections for her chronic migraines. (*Id.* at 2490.) Dr. Whitehair noted Harris had headaches located in the frontal region and consisting of pressure and pulsating, with the worst pain in the past month a 10/10. (*Id.*) Related symptoms included nausea, photophobia, and phonophobia. (*Id.*) Noise and smells made Harris' headaches worse, while sleep, quiet, and a dark room improved them. (*Id.*) Harris reported more than 15 migraines a month that lasted several hours to a full day. (*Id.*) Harris took Topamax and Effexor to prevent her migraines with partial relief and took Tylenol and ibuprofen with no relief. (*Id.*) Dr. Whitehair administered the Botox injection and recommended repeat injections in three plus months. (*Id.* at 2491.)

The ALJ's subjective symptom analysis makes clear he thought Harris was exaggerating her symptoms or otherwise malingering:

> Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the conservative treatment history, the longitudinal medical record, the claimant's statements, and the claimant's presentation on examination. The claimant's allegations are not entirely consistent with the evidence. The claimant had significant discrepancies with her reported symptoms and her alleged symptoms were not explained by her medical conditions. For instance, she completed two function reports less than a month apart, yet had several discrepancies in her alleged daily activities between those

24

two forms. (Exhibits C1E, C5E). She claimed to have significant trouble walking, but noted to be using a treadmill. (Exhibit C13F:11).

She was a very poor historian. (Exhibit C15F:60). She told mental health providers that she had over fifty illnesses. (Exhibit C15F:54). She would insist that she had heart issues and a stroke, despite the medical evidence showing she did not. (Exhibit C17F:54; Exhibit C22F). She was noted to be somewhat inconsistent with the degree of her alleged abdominal pain. There was clearly a discordance between her complaints and her clinical signs. (Exhibit C8F:19).

She recently described having spells of paralysis on the left side of her body. While psychologists believed this was a conversion disorder, neurologist believed she was malingering. At times, she claimed she could not lift her leg, but was then seen able to walk. There was a question about limitations seen on exam as being caused by lack of effort rather than lack of ability. (Exhibit C14F:14). Her spells of paralysis were likely psychogenic. (Exhibit C14F:23).

Numerous inconsistencies were noted on neurological examinations. For example, she was instructed to raise her left leg, but did not push down with her right leg while supposedly trying to lift her left leg. This suggested she was not actually trying to raise her left leg. She appeared to smile at a joke, but then claimed she could not smile when she was instructed to do so. She could move her eyebrows up while talking, but again claimed she could not do so when asked to raise her eyebrows. The numbness she described in her left forearm was in a non-dermatomal distribution. She claimed her skin felt cold, which ruled out a lesion that would have made her skin feel hot instead of cold. She claimed she could not move her head to the left or right, reflecting poor effort. (Exhibit C17F:10). Multiple signs on her physical exam were not compatible with a primary neurological deficit. There was no neurological explanation for non-functioning cranial nerves on her left side with left sided face and body weakness, numbness, or tingling. (Exhibit C17F:24). They lifted her left arm above her head and then dropped it. Despite claiming she could not move her left arm, she could stop her left arm from landing on her face. (Exhibit C18F:83). She was noted to lack effort during testing. (Exhibit C17F:114). Similar issues with inconsistent exam findings were noted in the claimant's prior claim as well. (Exhibit C1A:12-13). Thus, the claimant's allegations are not entirely consistent with the evidence.

(*Id.* at 35-36.)

However, none of the record evidence cited by the ALJ relates to Harris' headaches. There is no record evidence that her treatment providers thought she was malingering or exaggerating her symptoms

when it came to her headaches.[4]   In fact, in March 2020, Harris saw CNP Wilkes for continued migraines that she rated as more than a 10/10 on a pain scale.  (*Id.* at 1148.)  Wilkes noted Harris was ill-appearing on examination.  (*Id.* at 1149.)  Wilkes referred Harris to the emergency department for pain management as she was taking all her migraine medication without much relief and over the counter medications would not help.  (*Id.* at 1149.)   In addition, as discussed above, Harris was consistent in her complaints of regular headaches after March 2019 despite her adherence to prescribed treatment of Topamax, Effexor, and over the counter pain medications.  Therefore, the ALJ failed to build an accurate and logical bridge from the evidence to the his Step Three finding.

For these reasons, the undersigned finds that Harris has raised a substantial question as to Listing 11.02.  Therefore, this matter should be remanded so the ALJ can properly evaluate whether Harris' migraines equaled Listing 11.02 and properly explain his determination.  As the undersigned recommends remand on this issue, in the interest of judicial economy, the undersigned will not address Harris' additional assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

Dated: April 26, 2023                              *s/ Jonathan Greenberg*
                                                   Jonathan D. Greenberg
                                                   United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**

---

[4] Furthermore, the undersigned questions the ALJ's determination that Harris is less than credible for complaining of symptoms later thought to be psychogenic in nature.